**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
|  | ) Case No. 02 B 48191 |
| UAL CORPORATION, *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Hon. Eugene R. Wedoff |
|  | ) |
|  | ) Hearing Date: March 17, 2006 |
|  | ) Hearing Time: 9:30 a.m. |

**NOTICE OF FILING**

**PLEASE TAKE NOTICE** that on Wednesday, March 8, 2006 we caused to be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois Eastern Division the attached **RESPONSE OF GENERAL FOODS CREDIT CORPORATION TO REORGANIZED DEBTORS' OBJECTION TO GFCC AMENDED AIRCRAFT AND TAX INDEMNITY CLAIM NO. 44909** (Related to Docket No. 15223).

Dated: Chicago, Illinois
       March 8, 2006

                                    GENERAL FOODS CREDIT CORPORATION


                                    By: /s/ John J. Voorhees, Jr.
                                        One of Its Attorneys

| | |
|---|---|
| David Abbott (ARDC # 3126754) | Jonathan D. Kron (ARDC # 6190570) |
| Mayer, Brown, Rowe & Maw LLP | David S. Curry (ARDC #6184327) |
| 1675 Broadway | Robert A. Kelman (ARDC # 1440470) |
| New York, NY  10019-5820 | John J. Voorhees, Jr. (ARDC #6209292) |
| Telephone:     (212) 506-2500 | Mayer, Brown, Rowe & Maw LLP |
| Facsimile:     (212) 262-1910 | 71 South Wacker Drive |
|  | Chicago, Illinois 60606 |
|  | Telephone: (312) 782-0600 |
|  | Facsimile: (312) 701-7711 |

Counsel for General Foods Credit Corporation

1

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 02 B 48191 |
| UAL CORPORATION, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Eugene R. Wedoff |
| | ) | |
| | ) | Hearing Date: March 17, 2006 |
| | ) | Hearing Time: 9:30 a.m. |

**RESPONSE OF GENERAL FOODS CREDIT CORPORATION TO
REORGANIZED DEBTORS' OBJECTION TO GFCC AMENDED
AIRCRAFT AND TAX INDEMNITY CLAIM NO. 44909**
(Related to Docket Entry #15223)

General Foods Credit Corporation ("GFCC") files this Response to Reorganized Debtors' Objection To GFCC Amended Aircraft And Tax Indemnity Claim No. 44909 (the "Response") and in support thereof states as follows:

**INTRODUCTION**

1. GFCC has a claim in the amount of $96,206,880.22 against United Air Lines, Inc. ("United") for indemnification, arising out of tax and general indemnity agreements entered into between GFCC and United in connection with six leveraged lease transactions (the "Amended TIA Claim").[1] Prior to its amendment, GFCC's tax indemnity claim (claim number 43010) was included in United's omnibus objection to tax indemnity claims (the "Omnibus Objection"). GFCC filed both a response [Docket No. 13814] (the "Initial Response") and a sur-reply [Docket

---

[1] GFCC's Amended TIA Claim (No. 44909) in the amount of $96,206,880.22 was filed on January 16, 2006 as an amendment to claim number 43010. GFCC filed a separate amended claim also in the amount of $96,206,880.22 on January 16, 2006 against UAL Corporation, the guarantor of the Amended TIA Claim. No objection has been filed with respect to GFCC's claim against UAL Corporation.

CHDB04 13306196.3  08-Mar-06 13:54                      1

No. 14195] (the "Sur-Reply") to the Omnibus Objection, which are attached hereto as Exhibits A and B to this Response and are incorporated herein by reference.[2]

2. On February 15, 2006, United and its codebtors (the "Debtors") filed the Reorganized Debtors' Objection To GFCC Amended Aircraft And Tax Indemnity Claim No. 44909 [Docket No. 15223] (the "Amended Objection"), which superseded the Omnibus Objection. The objections raised by the Debtors in the Amended Objection are not different than those set forth in the Omnibus Objection. However, not all of the objections raised with respect to other owner participants' tax indemnity claims in the Omnibus Objection are applicable to GFCC[3] and, therefore, the Debtors' new focus on GFCC's Amended TIA Claim merits a response by GFCC to address the objections that the Debtors have now expressed with greater particularity and to put those objections into the context of the pleadings filed in connection with the Debtors' Omnibus Objection.

3. Pursuant to the Omnibus Objection, the Debtors objected to the Amended TIA Claim on two general grounds:

- that the tax indemnity component of the claim should be disallowed to the extent that it conflicts with the formula proposed by the Debtors; and

- that any "Collateral-related" claims, including GFCC's general indemnity claims, were pledged to the applicable Indenture Trustees and, consequently, should be disallowed as belonging to the applicable Indenture Trustees instead of GFCC, the Owner Participant.

---

[2] The operative documents, which were filed with the Court as exhibits to GFCC's Initial Response, are voluminous. Consequently, only the narrative portion of the Initial Response is attached hereto as Exhibit A, although the entire Initial Response is incorporated herein by reference.

[3] The Debtors' characterization of GFCC as one of a handful of holdouts that have not settled the objections raised by the omnibus objection is disingenuous. GFCC is in a substantively different position than any other tax indemnity claimant. Virtually all of the other tax indemnity claims were objected to on the basis that they were duplicative of allowed Stipulated Loss Value ("SLV") claims asserted by certain indenture trustees. This issue was raised originally with respect to the claim of Walt Disney as a test case. Under a stipulation between GFCC and the Debtors, the Debtors acknowledged, among other things, that GFCC's tax indemnity claim was not calculated by reference to SLV.

4. The Debtors' Amended Objection continues to argue that, contrary to the express terms of the tax indemnity agreements (collectively, the "TIA"), the Court should replace the damage formulation found in the TIA with a formulation of the Debtors' own choosing. With respect to the general indemnity portion of the Amended TIA Claim, the Debtors now assert that GFCC's professional fees and expenses are not allowable because GFCC is an unsecured creditor. The Debtors' objections fail on both counts.

5. First, as also discussed in the Initial Response and the Sur-Reply, the formula by which the Debtors propose to calculate the Amended TIA Claim is nowhere to be found in the TIA, and is flatly contradicted by the relevant language contained therein. After giving effect to the language of the TIA, the tax indemnity portion of the Amended TIA Claim is $94,999,522.76, not the $16,649,636.51 proposed by the Debtors in Exhibit A to the Amended Objection.

6. Second, with respect to GFCC's contractual entitlement to a claim for professional fees and expenses, the Debtors ignore federal appellate court precedent that squarely addresses the issue. Those decisions hold that an unsecured creditor that has a contractual right to payment of professional fees may include those fees in its unsecured claim.

**ARGUMENT**

A. **Net Economic Return is the Core Protection For GFCC's Loss Under the TIA and it Cannot Be Ignored.**

7. The Debtors are guilty of the very sin that they incorrectly accuse GFCC of committing – they refuse to give effect to the most important provision in the TIA. The Debtors attempt to dismiss GFCC's contractual entitlement to a claim for maintaining its Net Economic Return as an attempt to "conjure up a guaranty" from the TIA "out of a simple reference" to the

term "Net Economic Return." But at the same time the Debtors ask the Court to ignore this essential provision of the TIA – to read it out of the contract.[4] The TIA does not provide GFCC with an unqualified entitlement to every payment necessary to preserve Net Economic Return, nor does GFCC suggest anything of the sort. As discussed below, the TIA clearly provides, however, that GFCC is entitled to a claim for maintaining its Net Economic Return in respect of the payment of tax liabilities, which are the circumstances presented here. The Debtors ignore the language of the TIA and instead, slavishly repeat the mantra of "Tax Savings" divorced from the meaning ascribed to that term by the TIA and the context in which accounting for any such savings is appropriate, seemingly in the belief that if the Debtors repeat their position that GFCC has Tax Savings enough times, it will become true. The reality is, however, that there will be no Tax Savings and in any event, any tax relief would not relate to taxes for which GFCC would have been responsible and consequently, there is no basis under the TIA, mitigation law or otherwise to reduce GFCC's Amended TIA Claim.

8.     GFCC's "simple" reference to Net Economic Return in its Initial Response goes to the very heart of the rights granted to GFCC under the TIA. The term "Net Economic Return" is found in the key clause of the principal sentence of that agreement. Section 5(b) of the TIA provides that:

> (b) <u>Indemnity</u>. *The amount payable by reason of any Loss shall be a lump sum amount which, on an After-Tax Basis, shall cause the Owner Participant's Net Economic Return to be maintained* after taking into account the sum of the following amounts payable by the Owner Participant with respect to such Loss: (A) the additional Federal and State income tax payable as a result of such Loss, and (B) any interest, additions to tax or penalties associated with such Federal income tax (adjusted to reflect any current

---

[4] The Debtors incorrectly claim that GFCC is "[conjuring] up a guaranty by" seeking to recoup all cash flows and residual value from its original equity investment. In fact, GFCC has claimed only the tax liability that will be incurred upon the foreclosure by the indenture trustee of its interest in the aircraft, which does not include all cash flows or residual value as demonstrated by the pricing runs attached as exhibit A to the Sur-Reply. GFCC is not seeking rent or residual, it is seeking payment of a claim under the TIA for taxes incurred.

    deductions available with respect to such interest, additions to tax and penalties) (the sum of (A) and (B) referred to as the "Before-Tax Amount").

(emphasis added). If the leases ran their course, GFCC's income taxes from these transactions would have been paid by GFCC from free cash flow remaining after payment of the debt, as is demonstrated by the pricing runs attached as Exhibit A to the Sur-Reply. However, the Debtors have now rejected the aircraft leases and GFCC will receive no further payments. The Indenture Trustee is in the process of foreclosing its interest in the aircraft. The foreclosure process is an "Operative Event" under the TIA that will cause GFCC to become obligated to pay approximately $95 million of income tax and to lose its bargained-for return on its equity investment. Because these tax liabilities are in addition to any tax liabilities which GFCC would have been required to fund, and therefore are in addition to any cash outflows anticipated in the calculation of GFCC's Net Economic Return, the TIA provides for payment of these tax liabilities by the Debtors.

   9. Furthermore, the Lease defines Net Economic Return in great detail.[5] The term Net Economic Return is used in the same fashion in Section 3(c) of each Lease,[6] which deals with the important concept of rental adjustments. The amount of rent payable under a lease goes to the very core of the agreement between the parties and Net Economic Return is used there in the identical fashion as it is used in the TIA, to ensure a proper and complete calculation of

---

[5] "Net Economic Return" means the Owner Participant's *net after-tax book yield, aggregate after-tax cash flow* and no less than 100% of book income for each year prior to the fifth anniversary of the Closing Date, and book income shall not be increased or decreased by more than 10% for each subsequent year of the Lease Term, utilizing the multiple investment sinking fund method of analysis *computed on the basis of the same methodology and assumptions as were utilized by the Owner Participant in determining Basic Rent,* Excess Amount, Stipulated Loss Value percentages, Termination Value percentages, Special Termination Value percentages and the PPO Percentage as of the Closing Date, as such assumptions may be adjusted for events which have been the basis for adjustments to Rent pursuant to Section 3(c) hereof. (emphasis supplied); *Lease* §1 at 11.

[6] All terms not otherwise defined herein shall have the meaning ascribed to them in the Initial Response, the Sur-Reply and the operative documents attached thereto as exhibits, as applicable.

amounts that the lessee, here United, is required to pay to the Lessor.[7] There are no trivial, simple or conjuring references to the term "Net Economic Return." That term was carefully crafted and it is used in these transactions to represent the very essence of the bargained-for consideration payable to GFCC.

10. A contract must be interpreted so as to give all of its provisions meaning. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (interpreting New York law and stating that a "contract 'should be construed so as to give full meaning and effect to all of its provisions'") *quoting Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003); *Musak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract . . ."). The Debtors would have the Court treat the TIA as though the concept of Net Economic Return does not exist. But Section 5(b) of the TIA quite clearly requires that GFCC's Net Economic Return be preserved by a lump sum payment to GFCC by United – a lump sum payment that accounts for all cash inflows and outflows so as to ensure that Net Economic Return is preserved on an after-tax basis. Thus, the lump sum payment must "take into account the additional federal and state income tax payable as a result of such loss."[8]

11. The Debtors are also wrong when they claim that GFCC has failed to account for Tax Savings as required by the TIA and general principles of contract damage mitigation. Contrary to the Amended Objection, GFCC will not "enjoy" any Tax Savings. The Debtors have

---

[7] Section 3(c)(i) of the Lease Agreement states "In the event that (A)…(B)…(C)…or (D)…then in each case the Basic Rent…shall be adjusted (upwards or downwards as the case may be) using the same methods and assumptions (as modified on account of the occurrence of any of the events referred to in clauses (A)-(D)) used to calculate Basic Rent…in each case in order to: (1) *maintain the Owner Participant's Net Economic Return* and (2) minimize the Net Present Value of Rents to Lessee to the extent possible consistent with clause (1) hereof." (emphasis added).
[8] *TIA* at § 5(b).

elected to reject these agreements and there are only tax liabilities remaining.  Tax Savings would occur if an Operative Event also gave rise to unanticipated tax deductions -- for example, if GFCC suffered a $10 million income inclusion from a United-financed aircraft upgrade, GFCC might then be entitled to an additional $10 million of depreciation deductions over time.  Such additional depreciation is a typical "tax savings."  However, the reality here is that once the Indenture Trustee forecloses upon the aircraft, GFCC will have a very large tax payment to make, but no future offsetting deductions or credits and, thus, no Tax Savings for which to account.

12.     To refer to being relieved of future tax liabilities as a "tax savings," as the Debtors do, is to suggest that somehow GFCC has benefited by this event.  It has not.  The calculation of Net Economic Return mandated by the TIA requires that any such future tax liabilities be satisfied with payments from the Debtors, a circumstance which the Debtors' default has rendered impossible to achieve.  To be considered a tax savings two elements must be present: (A) a future tax liability which was expected to be payable out of GFCC's <u>own</u> pocket and (B) GFCC being relieved from such liability.  That would be a savings – being relieved of an anticipated out-of-pocket liability.  Here we have the exact opposite – such tax liabilities were to have been paid from free cash flow under the Leases (as shown by the pricing runs) and not from GFCC's own pocket.  But now, absent payment under the TIA, they will be borne by GFCC.  There are no savings when a party is relieved of paying something it was not originally expected to pay from its own account, which is precisely the case here.

13.     Any consideration of the concept of mitigation must begin with the manner in which Section 5(c) of the TIA provides for Tax Savings to be taken into account.  The definition of Tax Savings specifies that Tax Savings are to be calculated as provided in Section 5(c) where

seven paragraphs are dedicated to that task.  Section 5(c) provides that Tax Savings are only to be taken into account if the Debtors are not in default.  Here by virtue of their rejection of the Lease, the Debtors are in default.  It is important to recognize that the default referenced in Section 5(c) is any default or event of default in the deal at large.  It is not limited to a default under the TIA.  Thus, the Debtors' right to include Tax Savings in the calculation of indemnity amounts under the TIA is expressly dependent upon whether United has defaulted on other payments or obligations under the Lease such as rental payments.  The Debtors can only get credit for any Tax Savings if they have fully performed the deal in general.  And because they have not so performed, the express terms of the TIA preclude them from using Tax Savings.

14.    This result is entirely consistent with – indeed, it is a part of – the requirement to maintain Net Economic Return as required by the TIA.  There is no, nor should there be any, duty to account for any such "tax savings" where due to a default of the Debtors the cash necessary to pay the anticipated taxes has not been received.  To count the tax savings independently of the obligations anticipated to pay such taxes would be to elevate the mitigation claim over the claim for damages itself.  The "tax savings" repayment provision is only intended to prevent GFCC from enjoying a windfall, a result which certainly will not occur here where GFCC has not only lost its investment but must come out of pocket to pay the taxes triggered by the foreclosure.  That provision cannot eliminate the basic requirement to maintain Net Economic Return.

15.    The Debtors' reliance on general contractual damage calculations and mitigation theories as an alternative basis for the Amended Objection fails for the same reasons.  Although the Debtors' cite cases involving facts very far removed from those in issue here (*see e.g. Stone v. Continental Airlines*, 804 N.Y.S 2d 652.658 (N.Y. Civ. Ct. 2005) (involving a father/daughter

going on a ski holiday and being bumped from a flight, where the only mitigation discussion by the Court seems to be the need to replace ski clothing with cheaper, less stylish substitutes if they arrange a substitute local ski trip)), GFCC nevertheless recognizes that mitigation is an important principle governing the calculation of damages under a contract. In fact, the TIA contains an extensive treatment of mitigation, which allows inclusion of Tax Savings consistent with maintaining Net Economic Return but only when the Debtors are not in default. The principle that the calculation of damages must account for any savings caused by the alleged breach is correct, but for the reasons cited above the Debtors' assumption that there will be Tax Savings is wrong.

16. Furthermore, general mitigation principles do not require that the claimant be bound to accept a method of reducing its loss which would amount to an abandonment of its claim for damages. See C.J.S. Damages §49. The Debtors' calculation of mitigation, far from maintaining GFCC's Net Economic Return, operates to eliminate it.

**B.    There is No Basis For the Disallowance or Reduction of the Gross-Up Portion of the Amended TIA Claim.**

17. GFCC's response to the Debtors' objection to the gross-up aspect of the Amended TIA Claim is addressed at length in the Initial Response. In summary, each TIA calls for a single lump sum payment calculated in accordance with certain assumptions which were negotiated by the parties and agreed to as necessary elements to preserving the after-tax cash flows, which are part of Net Economic Return. Therefore, any payment intended to satisfy an after-tax cash flow maintenance obligation must factor in tax liabilities on the amount owing itself, otherwise imposition of tax on the indemnity claim would result in a net amount receivable which is insufficient to preserve Net Economic Return. The so-called gross-up is not subject to

separate calculation but is a calculation agreed to by the parties that is embedded within the overall unified tax indemnity claim. It is a part of the calculation of the total amount owing under the terms of the TIA. And as such, only that total claim amount is then subject to pro rata treatment under the Debtors' Plan. The TIA does not provide for an interim payment calculation that is independently reduced by the expected distribution under the Plan and then subject to pro rata treatment again as part of a final calculation. To adopt the Debtors' formulation would result in an allowed claim that does not even remotely equal the amount necessary to maintain GFCC's Net Economic Return.

18. In fact, the difficulty in pinpointing the value of consideration receivable (which must be determined for U.S. tax purposes, and which United's methodology requires) makes clear that the assumptions and calculations adopted by the parties in the TIA must be upheld and the open-ended and uncertain calculations offered by the Debtors must be rejected. Under the Debtors' formula the amount of "gross-up" will depend upon the value of this consideration which will not be known until at least the settlement date and even then not for many years later subject to any IRS audit of the valuation. (*See* O'Rourke, Kerry. "Valuation Uncertainty in Chapter 11 Reorganizations." *Columbia Business Law Review* 2 (2005) : 403.) The parties to the TIA expressly agreed to calculations that were not dependent on any such variables as part of a fair and balanced agreement as to how to calculate the indemnity. That calculation should not be set aside by a new and uncertain calculation of United's own choosing.

19. Moreover, even if the Court were to determine that the gross-up calculation should be independently determined and reduced to reflect the expected distribution to creditors of their bankruptcy estates, the assumed distribution rate of 5.5% is far too low in light of the prices being paid for unsecured claims in the market. That percentage is used in a calculation

which determines relative rights in relation to other claimants.  It is not the figure used for tax purposes, which must represent absolute values, not relative values.  Based on published news reports at the time, GFCC believes that claims were traded for amounts in excess of 20% of their face value at around the time of the effective date of the Debtors' plan of reorganization (and the common stock of United has increased by about 10% since then) and accordingly, if the Court were to agree with the Debtors' position that the gross-up should be reduced by expected distributions, an evidentiary hearing should be conducted to adjust the assumed distribution amount to reflect current values, which appear to be about four times what the Debtors calculate.

C.  **GFCC Has An Allowable Claim Under the General Indemnity That Includes Professional Fees and Expenses Incurred in Connection with the Aircraft.**

19.  The plain language of the General Indemnity found in §7(c) of the Participation Agreement provides that, "[United] . . . agrees to indemnify . . . [GFCC] against . . . all Expenses . . . incurred by . . . [GFCC] in any way relating to or arising out of . . . the Operative Documents, including any breach by [United] of . . . the performance of any of the transactions contemplated [by the Operative Documents]. . . ."[9]  "Expenses" is defined to include, among other things, reasonable attorneys fees and expenses and reasonable out-of-pocket expenses.[10]  As set forth in the Amended TIA Claim, GFCC has incurred attorneys and other professional advisor fees and expenses as well as other out-of-pocket expenses in connection with the Debtors' defaults and the assertion of GFCC's claims in an amount equal to $1,207,357.46.

20.  The Debtors attempt to dismiss GFCC's claim under the general indemnity provision of the Indenture on the theory that Section 506(b) implies that fees and expenses cannot be recovered in connection with an unsecured claim.  The Debtors cite *In re Loewen*

---

[9] *Participation Agreement* at § 7(c).
[10] *Lease* § 1 at 6-7.

*Group Int'l, Inc.*, 274 B.R. 427, 474 (Bankr. D. Del. 2002) as support for their argument. But they ignore Court of Appeals precedent squarely holding that post-petition attorneys fees are allowable as part of an unsecured claim. *In re Welzel*, 275 F.3d 1308, 1318 (11th Cir. 2001); *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1, 9 (1st Cir. 1992); s*ee also, Blair v. Bank One N.A.*, 307 B.R. 906 (N.D. Ill. 2004) (holding that a lender with an unsecured claim was entitled to include attorneys' fees in its claim on the basis of a contractual indemnity provision because none of the exclusions set forth in Section 502(b) applied). As these cases correctly hold, allowance of an unsecured claim is governed by Section 502, and nothing in that Section precludes allowance of a right to indemnification of professional fees. Thus, GFCC's claim for professional fees and expenses should be allowed as part of its claim.

21.  In short, the Amended Objection should be denied for the reasons stated herein. Accordingly, GFCC respectfully requests that the Court schedule a hearing to determine the amount of GFCC's claim. GFCC is prepared to demonstrate the calculation of all amounts owing in respect of tax liabilities necessary to preserve its Net Economic Return.

## CONCLUSION

WHEREFORE, GFCC respectfully requests that the Court overrule the Debtors'

Amended Objection to GFCC's claim number 44909 and grant such other relief as the Court deems necessary and proper under the circumstances. [11]

Dated: Chicago, Illinois
       March 8, 2005

GENERAL FOODS CREDIT CORPORATION

By: /s/ John J. Voorhees, Jr.
One of Its Attorneys

| | |
|---|---|
| David Abbott (ARDC # 3126754) | Jonathan D. Kron (ARDC # 6190570) |
| Mayer, Brown, Rowe & Maw LLP | David S. Curry (ARDC #6184327) |
| 1675 Broadway | Robert A. Kelman (ARDC # 1440470) |
| New York, NY 10019-5820 | John J. Voorhees, Jr. (ARDC #6209292) |
| Telephone: (212) 506-2500 | Mayer, Brown, Rowe & Maw LLP |
| Facsimile: (212) 262-1910 | 71 South Wacker Drive |
| | Chicago, Illinois 60606 |
| | Telephone: (312) 782-0600 |
| | Facsimile: (312) 701-7711 |

*Counsel for General Foods Credit Corporation*

---

[11] The Debtors may serve any reply to this Response on GFCC's counsel listed herein and may contact such counsel with respect to any proposed resolution of the Debtors' Omnibus Objection.

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) Case No. 02 B 48191 |
| UAL CORPORATION, *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Hon. Eugene R. Wedoff |
|  | ) |
|  | ) Hearing Date: March 17, 2006 |
|  | ) Hearing Time: 9:30 a.m. |

**CERTIFICATE OF SERVICE**

      John J. Voorhees, Jr., an attorney, hereby certifies that on March 8, 2006, he caused a copy of the **RESPONSE OF GENERAL FOODS CREDIT CORPORATION TO REORGANIZED DEBTORS' OBJECTION TO GFCC AMENDED AIRCRAFT AND TAX INDEMNITY CLAIM NO. 44909** (Related to Docket No. 15223) to be served upon the following via facsimile.

| *Counsel for the Reorganized Debtors:* | *Counsel for the Official Committee of Unsecured Creditors:* |
|---|---|
| Kirkland & Ellis | Sonnenschein, Nath & Rosenthal LLP |
| 200 East Randolph Drive, Suite 6500 | 8000 Sears Tower |
| Chicago, IL 60601 | Chicago, IL 60606 |
| Attn: Marc Kieselstein, Erik Chalut and Rebecca Fruchtman | Attn: Fruman Jacobson and Patrick Maxcy |
| Attn: (312) 861-2200 - Facsimile | (312) 876-7934 - Facsimile |
| *Office of the United States Trustee:* | Sonnenschein, Nath & Rosenthal LLP |
| 227 West Monroe, Suite 3350 | 1221 Avenue of the Americas |
| Chicago, IL 60606 | New York, NY 10020 |
| Attn: Kathryn M. Gleason | Attn: Carole Neville |
| 312-886-5794.- Facsimile | (312) 876-7934 - Facsimile |
|  | (212) 768-6800 - Facsimile |

                                                                                /s/ John J. Voorhees, Jr.

| | |
|---|---|
| David Abbott (ARDC # 3126754) | Jonathan D. Kron (ARDC # 6190570) |
| Mayer, Brown, Rowe & Maw LLP | David S. Curry (ARDC #6184327) |
| 1675 Broadway | Robert A. Kelman (ARDC # 1440470) |
| New York, NY  10019-5820 | John J. Voorhees, Jr. (ARDC #6209292) |
| Telephone:    (212) 506-2500 | Mayer, Brown, Rowe & Maw LLP |
| Facsimile:    (212) 262-1910 | 71 South Wacker Drive |
| | Chicago, Illinois 60606 |
| | Telephone: (312) 782-0600 |
| | Facsimile: (312) 701-7711 |

Counsel for General Foods Credit Corporation

3