FILED
JUN 2 3 2006
EUGENE R. WEDOFF
BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **In re:** | **CHAPTER 11** |
| **UAL CORPORATION, et al.,** | **CASE NO. 02 B 48191** **(Jointly Administered)** |
| **Debtors.** | |

## MEMORANDUM OF DECISION

This matter is before the court on the debtors' objection to a claim of General Foods Credit Corporation ("General Foods") in an amount exceeding $96 million. The claim has two components: a claim of about $95 million under a Tax Indemnity Agreement (or "TIA"), and an expense claim for the balance. The parties have agreed on the treatment of the expense claim, leaving only the TIA claim in dispute. For the reasons set forth below, this claim must take into account tax savings that General Foods realizes; the claim must then be calculated with the "gross-up" provided in the TIA, undiminished by fact that the claim will be paid in a reduced amount pursuant to the debtors' Chapter 11 plan.

### Jurisdiction

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate

orders and judgments in core proceedings within the case. The pending adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). This court may therefore enter a final judgment determining the allowed amount of General Foods' claim.

**Factual Background**

The relevant facts are not in dispute and no evidentiary hearing on the debtors' claim objection was requested.

General Foods' claim arises out of its participation in six leveraged lease transactions through which United Air Lines, Inc. ("United") obtained the use of six aircraft. In each transaction, United purchased the aircraft from a manufacturer and contemporaneously sold all of its interests to an "owner trustee." Concurrent with the sale of the aircraft to the owner trustee, the owner trustee leased the aircraft back to United pursuant to a lease agreement.

General Foods, as "owner participant," provided equity financing for each purchase, which financing represented only a portion of the cost of the aircraft. To finance the balance of the investment, an owner trustee—which holds title for the benefit of the owner participant—issued non-recourse equipment notes through a trust indenture and mortgage. The indenture trustee, acting on behalf of the noteholders, obtained a security interest in the owner trustee's rights both in each aircraft and under each lease with United.[1]

[1] Several years later, the equipment notes secured by the aircraft were also given as security for notes issued to holders of public debt. That financing transaction did not otherwise alter the underlying leases for the aircraft.

As part of these transactions, General Foods anticipated receiving a defined return—primarily based on cash flow from the leases (net of the amount needed to service the equipment notes) and on the tax consequences arising from the structure of the transaction (amortization of the aircraft and interest deductions from note payments). In order to protect against tax consequences that were not anticipated, United and General Foods entered into six substantially similar TIAs, one for each of the financed aircraft. Each TIA sets forth the terms under which United as lessee is required to indemnify General Foods against tax consequences that differ from the ones factored into the pricing of the lease.[2]

The financing transactions, including the TIAs, were entered into in or around December 1, 1992. In December 2002, United filed the pending bankruptcy case and ceased making rental payments under the leases. This precipitated a default under the mortgages, repossession of the aircraft by the indenture trustees, and their assertion of secured claims against United. As a result of a settlement between United and the indenture trustees, the six aircraft have been or will be sold, and General Foods will be taxed on the gain recognized at the time of sale. As a result of United's lease default, however, General Foods will avoid paying taxes on rent that it otherwise would have received under the leases.

[2] Because the operative documents for each transaction are substantially similar, the parties have presented their arguments based on the operative documents for a single transaction, involving an aircraft with tail number N569UA. For ease of discussion, this opinion addresses the issues raised by the debtors' objection as if there had been a single transaction, with a single lease (the "Lease"), indenture (the "Indenture") and TIA. However, the analysis applies to all six transactions.

**Discussion**

General Foods has a claim against United under the TIAs for the additional tax liabilities that it will incur as a result of the indenture trustee's foreclosure and sale of the aircraft. The debtors object to the amount of this claim on two grounds. The first argument is that General Foods must reduce its TIA claim by the tax savings it will realize as a result of not receiving lease payments from United. The second argument deals with the "gross up" adjustment to General Foods' claim, which compensates General Foods for taxes that would be incurred on any payment that it receives pursuant to the TIAs. The debtors argue that General Foods must calculate this "gross up" based on the diminished payments that General Foods will actually receive on its TIA claims under United's Chapter 11 plan. The debtors' first argument is correct; the second is not.

Both of the bases for the claim objection depend on interpretation of the financing documents involved here. New York law governs the TIA and other transaction documents. TIA, § 11; Lease, § 23; Indenture, § 10.12. Under New York law, the court's role in interpreting a contract is to "ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004). "If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further." *Id.* "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Reiss v. Financial Performance Corp.*, 764 N.E.2d 958 (N.Y. 2001) (internal quotation marks and citation omitted). When multiple agreements are entered into as part of the same transaction, the instruments should be read together. *See Nau v. Vulcan Rail*

*& Construction Co.*, 36 N.E.2d 106, 110 (N.Y. 1941); *Flemington Nat. Bank & Trust Co. v. Domler Leasing Corp.*, 410 N.Y.S.2d 75, 77 (1978).

If the terms of an agreement are ambiguous, parol evidence may be considered to determine the meaning of the agreement. *See 67 Wall St. Co. v. Franklin Nat. Bank*, 333 N.E.2d 184, 186-87 (N.Y. 1975). However, neither United nor General Foods has argued that the TIA is ambiguous and neither has asked the court to consider parol evidence.

**A. The Offset Issue.**

Section 5(b) of the TIA sets forth the manner in which General Foods' claim under the TIA is to be calculated. For purposes of this dispute, the relevant provisions are the following:

> (b) Indemnity. The amount payable by reason of any Loss shall be a lump sum amount which, on an After-Tax Basis, shall cause the Owner Participant's Net Economic Return to be maintained after taking into account the sum of the following amounts payable by the Owner Participant with respect to such Loss: (A) the additional Federal and State income tax payable as a result of such Loss, and (B) any interest, additions to tax or penalties associates with such Federal income tax . . . (the sum of (A) and (B) referred to as the "Before-Tax Amount").
>
> The calculation of such lump sum amount shall: . . . (C) take into account any Tax Savings reasonably expected to be available to the Owner Participant as a result of the Loss or future Loss or Losses expected. . . . [3]

TIA, § 5(b).

The plain language of these provisions requires that General Foods' tax savings be offset against its increased liability. Section 5(b) provides that General Foods is enti-

[3] The TIA defines "Tax Savings" as the amount of Federal and State income tax savings, calculated as provided in Section 5(c), which General Foods recognizes as a result of a Loss. TIA, § 1 at 4 (definitions). General Foods has a "Loss" under the TIA if it cannot claim the interest or amortization deductions that were anticipated at the outset of the transaction. *Id.*, TIA, § 5(a) and § 2(d) and (m). Section 5(c) sets out a series of conclusive presumptions in order to determine the amount of Tax Savings resulting from a Loss, including the ability of General Foods to benefit from a reduction in income. *Id.*, § 5(c).

tled to payment of a "lump sum" that is calculated by "taking into account" both additional taxes, interest and penalties that it must pay as a result of a "Loss," and any future tax savings that it reasonably expects to receive. There is nothing in the relevant language that would allow the lump sum payment to include additional taxes and penalties payable by reason of a loss but exclude taxes avoided by reason of the loss. General Foods posits a variety of arguments to avoid the plain meaning of § 5(b), but none are persuasive.

General Foods' first argument is that there will be no tax savings because the foreclosure of the aircraft results in no future offsetting deductions or credits. The absence of future deductions or credits is not a relevant concern. The bargained-for tax consequences include not only the deductions that General Foods would enjoy but also all of the taxes that it would be required to pay. The transaction was structured to generate large deductions in the early years of the Lease and tax liability in the later years. Because General Foods will not have to pay taxes on income (rent) that it anticipated receiving in future years, it does in fact have tax savings as defined by the TIA.

General Foods' second argument attempts to negate the plain language of § 5(b) by focusing on the reference in that subsection to "Net Economic Return"—a defined term referring to the after-tax cash flow that General Foods intended to receive as a result of the transaction.[4] This cash flow consists of "free cash" (rent less debt service on the equipment notes) and the tax consequences arising from the transaction.

---

[4] "Net Economic Return" is defined in the Lease, § 1 at 11. The relevant part of the definition reads as follows:

As a result of United's default and the indenture trustee's foreclosure of the aircraft and exercise of rights under the Lease, General Foods has lost the free cash it anticipated receiving from the transaction. Thus, General Foods will experience a loss of Net Economic Return that substantially exceeds its indemnified tax loss. On this basis, General Foods argues that § 5(b)'s provision for a payment that maintains Net Economic Return eliminates the need to offset tax savings.

However, the reference to Net Economic Return in § (5)(b) does not increase TIA claims beyond the net change in tax consequences. Rather, it provides a cap on the claim. Under the TIA, General Foods receives a payment calculated on the basis of (A) additional taxes due to a "Loss," plus (B) resulting penalties and interest, less (C) tax savings. This amount is payable only as is necessary to maintain Net Economic Return, and thus General Foods cannot receive a TIA payment that exceeds Net Economic Return. However, General Foods can also never receive more than the lump sum resulting from the (A) + (B) - (C) calculation mandated by § 5(b).

The plain language of § 5(b) is thus conclusive of the need to deduct tax savings from General Foods' TIA claim. However, other provisions of the financing agreements confirm the need to deduct tax savings. The total damages available under the Lease (the

---

"Net Economic Return" means the Owner Participant's net after-tax book yield, aggregate after-tax cash flow and no less than 100% of book income for each year prior to the fifth anniversary of the Closing Date, and book income shall not be increased or decreased by more than 10% for each subsequent year of the Lease Term, utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions as were utilized by the Owner Participant in determining Basic Rent, Excess Amount, Stipulated Loss Value percentages . . . as of the Closing Date, as such assumptions may be adjusted for events which have been the basis for adjustments to Rent pursuant to Section 3(c) hereof.

benefits of which General Foods enjoys as owner participant) are defined as Stipulated Loss Value ("SLV"). Lease, § 15(d) (which subsection also notes that such payment is liquidated damages for loss of the benefit of the bargain). SLV includes not only the total cash flows under the Lease but also General Foods' expected tax benefits. See TIA, § 6(c), providing that payment of SLV under the Lease eliminates any obligation under the TIA.[5] But General Foods assigned all of the cash flows under the Lease as security to the indenture trustee. *See* Indenture at 2 (Granting Clause), 3-4 (Habendum Clause). Thus the only part of SLV that the TIA protects is the net tax consequences. If the TIA indemnity covered more than net tax consequences, it would erode the cash flow from the Lease securing the equipment notes.

Faced with the assignment of cash flow to the indenture trustee, General Foods argues that the indenture trustee only took a security interest in the cash flow necessary to cover debt service, not the free cash. This argument is without merit; the Indenture plainly provides that all rent payments are assigned to the indenture trustee for security.[6] Income beyond the amount necessary to service the debt provided additional security to the indenture trustee.

Finally, General Foods argues that even if the indenture trustee has a security interest in all cash flows under the Lease, its interest in the cash was reduced upon United's

---

[5] *See also* Ian Shrank, *Equipment Leasing – Leverage Leasing* (Practising Law Institute 2006), § 2:5.3 (stipulated loss values set what payment at any given time will pay the outstanding debt, the investor's equity investment and provide the investor with a certain yield on the investment).

[6] The Granting Clause of the Indenture provides that the owner trustee has transferred to the indenture trustee all of the owner trustee's rights under the Lease, including all rent and other payments made pursuant to the Lease. Indenture at 2.

default. This argument is based on § 8 of the TIA, which provides that if a payment is made under the TIA, SLV is adjusted to reflect the loss.[7]

Section 8 contemplates that the Lease remains in effect; it adjusts SLV only after an actual payment under the TIA, which would only take place while the equipment notes are outstanding. If the notes are in default and the indenture trustee takes rights to payment under the Lease, the notes would have to be paid in full before any of the cash flows under the Lease would go to the owner trustee as Lessor. Thus, in bankruptcy, the indenture trustee's unsecured claim includes all cash flows due under the Lease. Upon United's default, General Foods lost that portion of SLV that relates to the free cash as a result of the assignment to the indenture trustee. The only claim that General Foods continues to hold relates to anticipated tax consequences. Unless the indenture trustee's claim is paid in full, General Foods is entitled to no part of the cash flow under the Lease and the details of the indenture trustee's settlement with United are irrelevant.

In sum, the governing language of § 5(b) of the TIA, as well as the overall structure of the financing into which the TIA fits, requires General Foods' claim for indemnity to take into account both increased tax liability and tax savings.

---

[7] Section 8 of the TIA provides as follows:

> SECTION 8. Adjustment of Stipulated Loss Value and Termination Value. If any amount is required to be paid hereunder by the Lessee with respect to a Loss and is actually so paid, the Owner Participant shall cause the Lessor to recompute Stipulated Loss Value and Termination Value percentages with respect to the Aircraft to reflect such Loss in accordance with the manner in which such values were originally computed, or adjusted pursuant to Section 3 of the Lease, by the Owner Participant, . . . In no event shall Stipulated Loss Value or Termination Value as recomputed for any period be less than the principal amount, premium, if any, and accrued interest on the Loan Certificates. Any recomputation under this Section 8 shall not take into account any Tax Law Changes.

**B. The Gross-Up Issue.**

The second issue in dispute is the manner in which General Foods calculated what is referred to as the "gross up" of its claim. Pursuant to § 5(b), General Foods is entitled to a payment under the TIA for an amount that pays General Foods for the change in tax consequences on an "After-Tax Basis."[8] Because payment of an amount due under a tax indemnity is, itself, taxable, the claim must be "grossed-up" or increased so that after taxes are paid, General Foods is compensated in full for the change in tax consequences.

Debtors contend that General Foods' gross-up adjustment must take into account that General Foods' claim in the bankruptcy will not be paid in full. According to debtors, General Foods must first calculate the amount of tax liability it will incur as a result of the foreclosure, and then must estimate the amount it will actually receive from the debtors and calculate its gross-up based on the tax consequences resulting from that actual distribution.

Debtors' argument proposes a method of calculation that is inconsistent with the terms of both the TIA and the Bankruptcy Code. General Foods is entitled to calculate its claim as of the date of the bankruptcy filing pursuant to §§ 365(g) and 502(b) of the Code, and in a manner that is consistent with the remedies that would be afforded it under New York law. *See In re Udell*, 18 f.3d 403 (7th Cir. 1994) (state law determined creditor's contractual remedies), citing *Butner v. United States*, 440 U.S. 48, 544-55 (1979).

Debtors do not cite to any decision that suggests a New York court would calculate General Foods' damages differently from the formula set forth in the parties' con-

---

[8] The TIA defines "After-Tax Basis" as an amount that, after the deduction of all taxes General Foods is required to pay upon receipt of such amount, is equal to the payment United is required to make to General Foods under the TIA. TIA, § 1(a).

tract. Nor do debtors cite to any provision of the Bankruptcy Code that allows a debtor to alter the provisions governing after-tax computation of damages. Rather, it is axiomatic that a claim calculated immediately prior to the petition date cannot take into effect of the bankruptcy itself on the amount that a creditor is entitled to receive.

Debtors also argue that the contractual provision allowing for the "Before Tax Amount" to be increased in the manner set forth in the agreement is unenforceable, analogizing it to default charges such as postpetition interest and attorney's fees, citing *In re Plymouth House Health Care Ctr.*, 2005 WL 2589201 at *5 (Bankr. E.D. Penn. Mar. 15, 2005), and *In re Pride Companies*, L.P., 285 B.R. 366, 372 (Bankr. N.D. Tex. 2002). However, both of these decisions address a creditor's right to recover postpetition attorneys' fees and costs. Accordingly, they actually support General Foods' position. Postpetition attorneys' fees and interest are elements of damages that arise and can only be calculated after the bankruptcy filing, and so are not part of the claim required by § 502(b) to be calculated as of the date of the bankruptcy filing. General Foods' claim for damages, on the other hand, properly includes the gross-up as calculated as of the petition date, while the debtors are attempting to modify the claim based on postpetition events.

## Conclusion

For the reasons set forth above, debtors' objection to General Foods' claim is sustained in part and overruled in part. General Foods' claim must take into account the tax savings that it will realize in the future; its claim shall then be calculated with the "gross-up" contained in the TIA, without regard to the percentage of its claim that will be paid in this proceeding.

Dated: June 23, 2006

Eugene R. Wedoff
United States Bankruptcy Judge